Anne D. WYATT, Eastern Minerals International, Inc., Van Buren Minerals Corporation, Milton J. Bernos, Jr., Nancy Wyatt Zorn, Mary Anne Wyatt, Wilson W. Wyatt, Jr., and Martin P. Duffy, Executor of Wilson Wyatt, Sr.'s Estate, Plaintiffs–Cross Appellants,

v.

UNITED STATES, Defendant–Appellant.

Nos. 99–5054, 99–5059.

United States Court of Appeals, Federal Circuit.

Nov. 19, 2001.

Raymond D. Battocchi, Gabeler, Battocchi & Griggs LLC, of McLean, VA, argued for plaintiffs-cross appellants. With him on the brief were John R. Powell, and Vicky Ann Paisley. Of counsel on the brief was Walter H. Fleischer, of Washington, DC.

Jeffrey C. Dobbins, Attorney, Environment and Natural Resources Division, Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Lois J. Schiffer, Assistant Attorney General; Marc A. Smith, and Andrew C. Mergen, Attorneys. Of counsel on the brief was Daniel W. Kilduff, Attorney, Office of the Solicitor, Department of the Interior, of Washington, DC.

Charles F. Lettow, Cleary, Gottlieb, Steen & Hamilton, of Washington, DC, for amicus curiae Cane Tennessee, Inc. Of counsel on the brief were Michael A. Mazzuchi, and Timothy A. Vogel.

Before NEWMAN, BRYSON, and GAJARSA, Circuit Judges.

GAJARSA, Circuit Judge.

In this regulatory takings case, the United States appeals the October 6, 1996 and November 25, 1997 judgments of the United States Court of Federal Claims on the issue of liability. Plaintiff Van Buren Mineral Corporation ("Van Buren") cross-appeals the trial court's judgment that its claims are unripe. Plaintiffs Eastern Mineral International, Inc. ("EMI"), Wilson Wyatt, Sr., and Anne D. Wyatt ("the Wyatts") further cross-appeal the trial court's award of damages.[1]

After dismissing a variety of the plaintiffs' claims as unripe, the trial court held that the federal government had effected a permanent regulatory taking of the property interests of EMI and the Wyatts. *E. Minerals Int'l, Inc. v. United States*, 36 Fed. Cl. 541, 552 (1996). The court further held the government liable for the takings, and awarded EMI $15,866,311 and the Wyatts $3,743,766, plus compound interest. *E. Minerals Int'l, Inc. v. United States*, 39 Fed. Cl. 621, 631 (1997). For the reasons discussed below, we reverse the judgment of the trial court on the issue of liability, and dismiss the cross-appeals as moot.

## I. BACKGROUND

This case concerns the administration of the Surface Mining Control and Reclamation Act of 1977 ("SMCRA" or the "Act"), 30 U.S.C. § 1201 *et seq.*. Concerned that "many surface mining operations result in disturbances of surface areas and adversely affect commerce and the public welfare," 30 U.S.C. § 1201(b), Congress passed the Act to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C.

---

**1.** A brief urging affirmance as to liability and partial reversal and remand as to damages was filed by Cane Tennessee, Inc. as *amicus curiae.*

§ 1202(a) (1994). The Act created the Office of Surface Mining Regulation and Enforcement ("OSM") within the Department of the Interior and authorized the Secretary of the Interior ("Secretary") to administer the Act by promulgating regulations and enforcing its provisions. 30 U.S.C. §§ 1211(a), 1211(c) (1994); *see also Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 268–69, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981).

The Act regulates surface coal mining through a two-phase program designed to balance both federal and state interests. *See Hodel*, 452 U.S. at 289, 101 S.Ct. 2352 (describing the Act as establishing "a program of cooperative federalism"). During the initial regulatory phase the federal government promulgates and enforces basic environmental protection standards. These standards include requirements for restoration of land, preservation of topsoil, and protection of the hydrological balance. 30 U.S.C. §§ 1252(c), 1265(b) (1994). The federal standards are complemented by continuing state regulations. States can issue permits for surface mining, but only if the applicant complied with federal interim standards concerning the environmental impact of the proposed mine. *Id.* § 1252(b).

The initial phase is followed by a permanent phase, during which each state adopts its own regulatory program to provide for compliance with the various federal performance standards. *Id.* § 1253(a). The goal of the program is to allow states to tailor their permitting schemes to meet their own needs, within a general framework of federal oversight. If a state's program does not meet basic federal standards, the Secretary is required to step in with his own program for assuring compliance. *Id.* § 1254(b). Under no circumstances may a person engage in surface coal mining without a permit from an appropriate regulatory agency. *Id.* § 1256(a).

The property at issue in this case is located in Bledsoe and Van Buren Counties in southeastern Tennessee, adjacent to the Fall Creek Falls State Park. On December 12, 1975, Wilson Wyatt, Sr. and Anne D. Wyatt sold the property to Milton J. Bernos, Jr. Under the conditions of the sale, as amended, the Wyatts were to receive $4.3 million in installments and retain a 3.5% royalty interest in all coal extracted from the property.

In December 1978, Bernos canceled his contract with the Wyatts. By this time, Bernos had acquired a portion of the property, but the majority remained in the Wyatts' hands. In 1979, the Wyatts sold their remaining interest in the property to Cane Co., Ltd. (later Cane Tennessee, Inc.) ("Cane"). Once again, the Wyatts retained a 3.5% royalty interest in the minerals. Meanwhile, Bernos sold his interest in the property to Colten, Inc. ("Colten"). Colten then immediately entered into a lease with Van Buren, a company wholly owned by Bernos.

Thereafter, Cane granted an exclusive lease to mine the property to EMI, another company wholly owned by Bernos. Although the term of this lease was set to expire on February 28, 1991, EMI had the right to extend the lease term for four ten-year terms upon 180 days notice to Cane. EMI could not, however, exercise the right to extend the lease term after August 1990.

After signing the lease, EMI set out to secure the necessary permits to begin mining the property. On February 4, 1980, the Division of Surface Mining and Reclamation of the Tennessee Department of Conservation ("DSM") issued EMI a one-year permit under DSM's interim regulatory program. As required under the Act, DSM found that the proposed mine would

not "adversely affect" the adjacent park. *See id.* § 1272(e)(3). The permit granted EMI permission to disturb thirty-three acres on the property. With the permits in hand, EMI executed a box cut on the property to extract coal from the Sewannee coal seam, and also constructed various "improvements" to the land, including a sediment pond, a backfill area, and various roads. Adhering to the requirements of 30 U.S.C. § 1272(e)(5), EMI located the box cut just over 300 feet from the property's boundary with the Fall Creek Falls State Park.

Four months after the permit expired, on June 18, 1981, EMI again applied for a permit from the DSM. On September 14, 1981, DSM granted EMI another one-year permit. After this permit expired, EMI filed another application with DSM for still another permit.[2] The DSM rejected this permit application on May 8, 1984. It found that EMI had not adequately addressed the issues of noise, water quality and subsidence.[3] On August 15, 1984, the Tennessee Surface Mining Board of Reclamation affirmed the rejection.

Later that year, OSM determined that Tennessee had not effectively implemented its SMCRA program. Pursuant to its authority under the Act, OSM revoked the state's authority, and assumed control of the Tennessee surface mining regulatory program. At the same time, under the regulations promulgated by the agency, the state retained joint reviewing authority.

OSM reviews permit applications in three stages. First, the agency reviews an application to determine if it is administratively complete. After the agency is satisfied that it has all the necessary information, it conducts a technical review to determine if the proposed mining operation meets all substantive legal requirements. Finally, OSM closes out the application, whereupon it addresses any final legal matters, such as the securing of any bonds.

In October of 1984, EMI applied for a new permit from OSM. In its application, EMI sought to disturb 26.3 acres of the Cane property and mine approximately 4,600 acres of coal. On December 31, 1984, OSM notified EMI that its application was administratively incomplete. After EMI acknowledged and corrected the deficiencies, OSM informed EMI that it would need the approval of the Tennessee DOC if OSM determined that the proposed mine would adversely affect the Fall Creek Falls Park, pursuant to 30 U.S.C. § 1272(e)(3).

OSM then commenced its review of EMI's application. On May 30, 1985, OSM issued EMI a technical deficiency letter ("TDL") outlining various concerns about the proposed mine. Among these concerns were the effect of the mine on Cane Creek and the impact of the mine on the "scenic and solitude values of Falls Creek Falls State Park." On June 25, 1985, EMI responded to the TDL with a letter that included little of the information requested by OSM.

In August of 1985, the State of Tennessee exercised its joint-review authority, and objected to the permit application. The state believed that the mine would

---

2. By this time, DSM was reassigned to the Tennessee Department of Health and Environment.

3. DSM also noted that Mr. Bernos, the sole shareholder of EMI, had violated various coal mining regulations in the past. *See* 30 U.S.C. § 1260(c) (1994) (barring any applicant with outstanding environmental violations from receiving permit until agency receives assurances that violations have been resolved).

have adverse environmental impacts on the surrounding area. On December 12, 1985, OSM issued another TDL requiring specific information to satisfy the hydrologic and environmental impact requirements of the Act pursuant to 30 U.S.C. § 1257. This TDL contained five pages of specific information necessary for OSM to approve the application. On January 15, 1986, in response to the deficiency letters, EMI sought financial assistance in complying with the request for additional information from OSM's Small Operator Assistance Program ("SOAP").[4] On July 2, 1986, OSM denied the permit application before it acted on the SOAP application. The agency had concluded that the proposed mine would adversely impact the park by causing excessive noise and possibly adverse hydrological consequences.[5] On July 30, 1986, EMI appealed the denial to an administrative law judge ("ALJ").

This began a lengthy period of further review. Because OSM had not conclusively established a hydrological impact from the proposed mine, the ALJ asked the parties to work with one another to provide OSM the information it needed for its hydrological assessment. OSM also agreed to review EMI's claim that it enjoyed valid existing rights ("VER") in the property that relieved it from any ban on mining near the park. At EMI's request, OSM was ordered to decide the VER claim before EMI spent any additional funds on complying with OSM's request for more information. On January 20, 1988, OSM denied the claim for VER. On February 1, 1988, OSM submitted a revised TDL to EMI outlining the information it still required.

EMI did not respond to the February 1, 1988 TDL. Instead, it elected to apply again for SOAP funds. The August 1990 deadline for extending the Cane lease came and went without EMI exercising its option. As provided under its terms, the lease expired on February 28, 1991. Meanwhile, OSM had determined that any mining on the Cane and Colten lands would "adversely affect" the park. OSM was concerned about both surface water and groundwater discharges, and had decided that EMI could not assuage these concerns.

On August 25, 1993, OSM issued another TDL. Once again, OSM requested specific information from EMI necessary to complete its assessment. Although SOAP had funded drilling, a lineament study, and a fracture analysis, OSM found a number of deficiencies in the information supplied to the agency. On February 18, 1994, OSM again informed EMI that a response to the TDL was essential to the permit review. Finally, on April 13, 1994, OSM denied EMI's permit request.

The plaintiffs then filed suit in the United States Court of Federal Claims. The plaintiffs contended that the government's "extraordinary delay" in reviewing the permit application resulted in Bernos losing both long-term leases. After a trial, the court issued an opinion and order dated October 2, 1996 dismissing the claims of various plaintiffs for jurisdictional reasons. *E. Minerals*, 36 Fed. Cl. at 547–48. However, the court rejected the government's

---

**4.** SOAP's purpose "is to provide for eligible operators a determination of probable hydrologic consequences and a statement of results of test borings or core samplings which are required components of the permit application." 30 C.F.R. § 795.1; 30 C.F.R. § 795.6 (listing eligibility requirements for SOAP).

**5.** Having denied EMI's permit application, OSM then denied EMI's SOAP application based on 30 C.F.R. § 795.6(a)(3) (2001) (limiting SOAP eligibility to applicants not restricted from obtaining permit).

argument that EMI's claim was ripe only as to the Cane property, the only property for which it sought a permit. *Id.* at 547. The court agreed with the plaintiffs that any effort at securing a permit for the Colten property would have been futile. *Id.*

Addressing the merits of EMI and the Wyatts' claim, the court held that "[e]xtraordinary government delay may result in a constructive permit denial," and thus a permanent taking. *Id.* at 548. The court further held that the delay suffered by EMI and the Wyatts established a compensable economic impact and that EMI and the Wyatts had sufficient investment-backed expectations based on the two permits EMI had received earlier from DSM. *Id.* at 550–51.

In an order dated April 21, 1997, the court expounded on its earlier holding on the issue of liability. The government then moved for reconsideration. On November 25, 1997, the court granted the motion, but increased the compensation awarded to EMI and the Wyatts. Ultimately, on December 22, 1998, the court entered a final judgment awarding damages to both EMI and the Wyatts. The United States now appeals the judgment of the trial court, and the plaintiffs cross-appeal.

## II. STANDARD OF REVIEW

■ In reviewing the judgments of the Court of Federal Claims, this court examines findings of fact for clear error and reviews legal conclusions completely and independently. *Bass Enterprises Prod. Co. v. United States,* 133 F.3d 893, 895 (Fed.Cir.1998); *Columbia Gas Sys., Inc. v. United States,* 70 F.3d 1244, 1246 (Fed.Cir.1995). Whether or not a taking has occurred is a question of law based on factual underpinnings. *Alves v. United States,* 133 F.3d 1454, 1456 (Fed.Cir.1998);

*Bass Enters. Prod. Co. v. United States,* 133 F.3d 893, 895 (Fed.Cir.1998); *Whitney Benefits, Inc. v. United States,* 926 F.2d 1169, 1172–73 (Fed.Cir.1991). We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(3).

## III. DISCUSSION

### A. *Scope of the Asserted Taking*

The Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use without just compensation." U.S. Const. amend. V. The Supreme Court has recognized that the government may "take" private property by either physical invasion or regulation. *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1014–15, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Good v. United States,* 189 F.3d 1355, 1360 (Fed. Cir.1999).

■ As discussed above, the plaintiffs in this case allege regulatory takings by the federal government. It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation. *Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470, 473–74, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973); *Pro-Eco, Inc. v. Bd. of Comm'rs of Jay County, Indiana,* 57 F.3d 505, 509 (7th Cir.1995); *Cavin v. United States,* 956 F.2d 1131, 1134 (Fed. Cir.1992). In this case, OSM denied the permit in a final action on April 13, 1994. However, EMI voluntarily chose not to renew its leasehold interest in August of 1990. Thus, as of February 28, 1991, EMI possessed no valid property interest from which it could assert a takings claim.

EMI attempts to sidestep this critical requirement by arguing that the government action constituting the taking occurred in 1990, before the April 13, 1994 final action. In other words, EMI argues

that government delay *prior* to February 28, 1991 amounted to a permanent taking of its leasehold interest to mine the Cane property. Indeed, the trial court reasoned that "[i]f a permit had been granted before August 1990, [EMI] would have extended the lease for as long as necessary to mine all the merchantable coal in the ground." *E. Minerals*, 39 Fed. Cl. at 626. The trial court excused EMI's decision to relinquish its leasehold interest because it determined that the permit application, and thus the lease renewal, would have been futile. However, such speculative reasoning belies the bedrock requirement that the existence of a valid property interest is necessary in all takings claims. *See* U.S. Const. amend. V. It is true that the futility exception may sometimes excuse a property owner from submitting "multiple applications when the manner in which the first application was rejected makes it clear that no project will be approved." *Heck v. United States*, 134 F.3d 1468, 1472 (Fed.Cir.1998). However, the futility exception can never excuse the prerequisite that there exist a valid property interest for all takings cases.

■ The fact remains that EMI chose to relinquish its leasehold interest well before OSM's final decision. If EMI had renewed its lease, it may have been able to assert a permanent taking of its leasehold interest to mine the Cane property. How-ever, we cannot allow the voluntary relinquishment of a property interest to transform a temporary taking into a permanent taking.[6] Moreover, although EMI continued to pursue the permit application, it never informed OSM that it had relinquished its leasehold interest. Had OSM been aware of this fact, it would have been required to deny immediately the permit application because EMI no longer had a right of access to mine the property. *See* 30 C.F.R. § 778.15 (2001). For this reason, EMI cannot legally assert a permanent takings claim subsequent to February 28, 1991, and moreover, for the reasons discussed below, we find that there has been no compensable taking prior to February 28, 1991.

**B. Extraordinary Delay**

■ EMI argues that as of 1990, extraordinary government delay in processing its permit application constituted a taking. However, we hold that any delay in processing the permit application was not sufficiently "extraordinary" to constitute a taking.

■ We note that the existence and initiation of permit proceedings does not itself constitute a taking. Indeed, government "could hardly go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pa. Coal Co.*

6. Temporary takings are not different in kind from permanent takings. *First English Evangelical Lutheran Church v. L.A. County, Calif.*, 482 U.S. 304, 321, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). A temporary taking occurs when what would otherwise be a permanent taking is temporally cut short. For example, a temporary taking may occur when a court invalidates a regulation after the taking has already occurred. *See, e.g., Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 800 (Fed.Cir.1993). A temporary taking may also occur when the government elects to discontinue regulations after a taking has occurred. *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l. Planning Agency*, 216 F.3d 764, 778 (9th Cir.2000), *cert. granted*, —— U.S. ——, 121 S.Ct. 2589, 150 L.Ed.2d 749 (June 29, 2001). The essential element of a temporary taking is a finite start and end to the taking. In this case, as discussed above, the taking ended by act of law when EMI voluntarily relinquished its valid property interest. Thus, EMI is only entitled to assert a temporary taking from 1990 (when EMI asserts that OSM began its campaign of "extraordinary delay") through February 28, 1991 (when EMI gave up its leasehold interest).

*v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 67 L.Ed. 322 (1922). The mere requirement that "a person obtain a permit before engaging in a certain use of his or her property does not itself 'take' the property in any sense: after all, the very existence of a permit system implies that permission may be granted." *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 126–27, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). Moreover, mere "fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are incidents of ownership." *First English Evangelical Lutheran Church v. L.A. County, Calif.,* 482 U.S. 304, 320, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987).

■■■ However, it is true that a taking may occur by reason of "extraordinary delay in governmental decisionmaking." *Tabb Lakes,* 10 F.3d at 803. Other courts have recognized that extraordinary delay must be "substantial" and that the Supreme Court has condoned delays up to "approximately eight years." *Kawaoka v. City of Arroyo Grande,* 17 F.3d 1227, 1233 (9th Cir.1994) (citing *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985)); *see also Tahoe–Sierra,* 216 F.3d at 781–82 (holding that a temporary development moratorium of up to forty months did not constitute a temporary taking); *Dufau v. United States,* 22 Cl.Ct. 156, 163 (Cl.Ct. 1990) (holding that permit delay of sixteen months did not constitute a temporary taking). The length of the delay is not necessarily the primary factor to be considered when determining whether there is extraordinary government delay. Because delay is inherent in complex regulatory permitting schemes, we must examine the nature of the permitting process as well as the reasons for any delay. Moreover, it is the rare circumstance that we will find a taking based on extraordinary delay without a showing of bad faith. *Cf. Tabb Lakes,* 10 F.3d at 799.

■■■ Complex regulatory schemes often require detailed information before the issuance of a permit. The nature of the regulatory scheme is especially critical when the permitting process requires detailed technical information necessary to determine environmental impacts. Governmental agencies that implement complex permitting schemes should be afforded significant deference in determining what additional information is required to satisfy statutorily imposed obligations. Finally, we must recognize that delay in the permitting process may be attributable to the applicant as well as the government.

A brief synopsis of the application process demonstrates that OSM did not cause any extraordinary delay in this case. EMI applied for the permit at issue in October of 1984. In December of 1984, OSM informed EMI that the application was missing at least twenty-eight items of required administrative information. In March of 1985, after EMI provided the required information, OSM informed EMI that the application was administratively complete. Subsequently, OSM began its technical review of the application. In May of 1985, OSM informed EMI that its application did not contain all of the information necessary to complete the technical review. OSM requested at least eighteen specific items of information necessary to complete its technical review. Among other things, OSM requested that EMI provide documentation demonstrating that the mining operations (1) would not physically alter the flow of the nearby Cane Creek, (2) would not chemically alter the waters, (3) would not adversely impact the biological ecosystem of Cane Creek, and (4) would not adversely affect the aesthetic and environmental integrity of the nearby Fall

Creek Falls State Park ("State Park"). One month later, EMI provided a letter response to the OSM request.

In September of 1985, OSM informed EMI that its letter failed to include much of the information requested, and that additional "considerable information" would be necessary. In December of 1985, OSM informed EMI of at least twenty-nine specific pieces of information necessary to establish the environmental impact of mining on Cane Creek and the State Park. EMI did not respond to the request, and instead, in January of 1986, applied for SOAP funding. In July of 1986, OSM denied the permit application based on its conclusion that the mining operations would cause adverse impacts to the area due to excessive noise and adverse hydrologic consequences. EMI then appealed this decision to an ALJ. Throughout 1987, the appeal progressed before the ALJ. In January of 1988, the ALJ ordered OSM to provide another detailed TDL explaining exactly what information was required. OSM issued the additional TDL in February of 1988.

Again EMI did not respond to the request, and instead applied for SOAP funding. During the next year, EMI failed to respond to the February 1988 TDL. In May of 1988, OSM noted that EMI had not yet responded to the TDL, and informed EMI that its SOAP application was placed on hold due to the existence of administrative violations attributable to Bernos. In July of 1989, Bernos paid the civil penalties owed on the administrative violations. Over the next few months, SOAP funds were used to hire an engineering firm to investigate the hydrology of the area and prepare a geological report. In April of 1990, EMI submitted the report to OMS.

In July of 1990, OMS informed EMI that the SOAP report was inadequate and did not address all of the deficiencies in the application. Specifically, OSM noted that "little useful data was collected from the phase 1 SOAP study" and informed EMI that additional testing would be necessary to judge the full hydrological impact of mining operations. In August of 1990, EMI chose not to extend its leasehold interest in the Cane property. On February 28, 1991, EMI's leasehold interest in the Cane property was terminated.

Prior to this date, the record does not support a finding that there was "extraordinary" government delay. Indeed, the trial court determined that the delay did not become extraordinary until late 1990. *E. Minerals*, 36 Fed. Cl. at 548. The trial court reasoned that after 1990, "OSM's policy was to stop [EMI's] development without taking a final action." *E. Minerals*, 39 Fed. Cl. at 625. However, OSM's decision in July of 1990 to require additional information does not constitute extraordinary delay. As discussed above, we recognize that OSM has considerable technical expertise in determining the level of information necessary to provide an adequate hydrological study. OSM determined that the phase 1 SOAP study provided "[v]ery little useful hydrogeologic data" and that additional wells and pumping tests would be required. As noted, we must afford OSM significant deference in determining the extent of information necessary for a complete hydrogeologic report. Moreover, we also note that much of the delay through 1991 was caused by the failure of EMI to respond to OSM's requests for information, and the appellate process before the ALJ.[7] Finally, we ob-

7. We also note that some of the delay was due to EMI's pursuit of SOAP funding. It is important to point out that SOAP funding is not a guaranteed right in the permitting process. *See* 30 U.S.C. § 1257(c) (1994); 30 C.F.R. § 795 (2001). Applying for SOAP funding is

serve that the trial court's finding of bad faith delay on the part of OSM throughout the entire permitting process is inadequately supported. For these reasons, we hold that the plaintiff failed to establish the requisite showing of extraordinary government delay to constitute a temporary taking prior to February 28, 1991. Any finding by the trial court to the contrary is clearly erroneous.

## IV. CONCLUSION

Because EMI voluntarily relinquished its leasehold interest on February 28, 1991, it may only assert a takings claim prior to that date. There was no extraordinary government delay sufficient to constitute a taking. Accordingly, we reverse the judg-

ment of the Court of Federal Claims, and dismiss the cross-appeals as moot. In

view of this conclusion, we need not consider any of the other arguments submitted by the parties.

### *REVERSED.*

### *COSTS.*

No costs.

an elective process and does not guarantee that the permit applicant will receive funding.