# United States Court of Appeals for the Federal Circuit

05-5034, 5035

INDEPENDENCE PARK APARTMENTS,
PICO PLAZA APARTMENTS,
ST. ANDREWS GARDENS,
and
SHERMAN PARK APARTMENTS,

                    Plaintiffs-Cross Appellants,

v.

UNITED STATES,

                    Defendant-Appellant.

Richard P. Bress, Latham & Watkins, of Washington, DC, argued for plaintiffs-cross appellants. With him on the brief were Everett C. Johnson, Jr., Leonard A. Zax, Matthew K. Roskoski; and Susan S. Azad, of Los Angeles, California.

Mark R. Freeman, Attorney, Appellate Staff, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Peter D. Keisler, Assistant Attorney General and Mark B. Stern, Attorney.

Appealed from: United States Court of Federal Claims

Judge Charles Lettow

# United States Court of Appeals for the Federal Circuit

05-5034, -5035

INDEPENDENCE PARK APARTMENTS,
PICO PLAZA APARTMENTS,
ST. ANDREWS GARDENS,
and
SHERMAN PARK APARTMENTS,

          Plaintiffs-Cross-Appellants,

v.

UNITED STATES,

          Defendant-Appellant.

_____

DECIDED:  September 15, 2006
_____

ON PETITION FOR REHEARING

Before MICHEL, Chief Judge, NEWMAN, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

This case involves a takings claim by low-income housing providers who were barred by statute from prepaying their mortgages and leaving the federal low-income housing program.  In our initial opinion, we set forth a method for the trial court to value the taking as applied to two of the plaintiffs (St. Andrews Gardens and Sherman Park Apartments) that had entered "use agreements" with the government before Congress reinstated the right of housing providers in general to prepay their mortgages. Independence Park Apartments v. United States, 449 F.3d 1235 (Fed. Cir. 2006).

The government has filed a petition for rehearing challenging our valuation analysis as applied to the takings claims of those two plaintiffs. The government argues that our decision effectively uses a voluntary contractual agreement (the use agreements entered into by St. Andrews and Sherman Park in 1995) to extend the period of the taking of their prepayment rights beyond the date of the Housing Opportunity Program Extension Act of 1996 ("the HOPE Act"), which restored prepayment rights that had been taken away by earlier legislation in 1988 and 1990. For the reasons set forth below, we disagree.

The government treats this case as if Congress first relieved St. Andrews and Sherman Park of the statutory bar on the prepayment of their mortgages and then offered them the opportunity to enter into the use agreements that provided certain benefits in exchange for their agreement to remain in the federal low-income housing program. But that is not the way things happened. In 1988 and 1990, Congress enacted statutes forbidding owners in the low-income housing program from prepaying their mortgages. In 1995, St. Andrews and Sherman Park entered into the use agreements in which they agreed to remain in the federal low-income housing program in exchange for certain benefits. In 1996, Congress passed the HOPE Act, which effectively removed the prior statutory restrictions on prepayment, but did not alter the terms of the use agreements. Thus, at the time St. Andrews and Sherman Park entered into the use agreements, they faced a flat statutory prohibition on prepayment of their mortgages. Declining to enter the use agreements at that time would not have left them free to prepay their mortgages and leave the low-income housing program. In fact, as the plaintiffs have argued, if they had not entered into the use agreements but had

2

05-5034, -5035

continued to litigate their takings claims—and the HOPE Act had never been enacted—the government would likely have been able to argue that the plaintiffs were not entitled to the full measure of their damages in the takings case because they had failed to mitigate their damages by accepting the benefits of the use agreements. Once the plaintiffs entered into the use agreements, which locked them into the low-income housing program, any subsequent lifting of the statutory ban on prepayment of mortgages became irrelevant to them. For that reason, the government cannot point to the reinstatement of the right to prepay mortgages as reducing the amount of the damages that St. Andrews and Sherman Park can claim.

Some examples may make the flaw in the government's position clear. Suppose a state enacts a statute directing that certain property be converted into a public park. The owner of the property, who planned commercial development for the site, files an action claiming a taking. The state then offers to hire the owner to undertake the physical conversion of the property into a park. After the owner enters that contract (without waiving its right to sue for the taking of the property), the state repeals the legislation requiring that the property be converted into a park and argues that there was no compensable permanent taking, only a short interlude (or temporary taking) in which commercial use was not permitted. The state's argument, if accepted, would mean that it would get a park without paying just compensation for taking the property, and instead only paying for the cost of the conversion.

For an example closer to the facts of this case, suppose that at the same time that Congress enacted legislation permanently barring the plaintiffs from prepaying their mortgages, it offered use agreements worth half of what the prepayment bar cost the

3

plaintiffs, on the condition that the plaintiffs would agree to remain in the low-income housing program. Suppose further that the plaintiffs accepted the use agreements in order to reduce their damages (and avoid the government's claim that they had failed to mitigate their damages). Finally, suppose that as soon as the plaintiffs entered into the use agreements, thereby committing themselves to remain in the low-income housing program, Congress repealed the statutory prepayment ban. In that situation, the statutory prepayment ban might have lasted only days. Yet the government could not reasonably contend that in valuing the damages from the taking, the court would be limited to considering only the losses suffered by the plaintiffs during the few days that the statutory prepayment ban was in effect. If such an argument were accepted, the government would have been able, by this contrivance, to reduce its liability for the taking by 50 percent. Although the timing in this case is somewhat different, that is in essence what has happened here, and the government's argument that the enactment of the HOPE Act terminated the takings period for valuation purposes is as unappealing here as it is in the example.

The government contends that our decision in this appeal ignores the rule that takings damages are limited to just compensation for what was taken and do not encompass consequential damages. See, e.g., City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 711 (1999); Yuba Natural Res., Inc. v. United States, 904 F.2d 1577, 1581 (Fed. Cir. 1990). We do not believe our decision runs afoul of that rule. As the Supreme Court has recognized, the task of measuring just compensation can be difficult in certain instances and is not amenable to a rigid formula. See United States v. Commodities Trading Corp., 339 U.S. 121, 123 (1950) ("This Court has never

05-5034, -5035

attempted to prescribe a rigid rule for what is 'just compensation' under all circumstances and in all cases."); <u>United States v. Toronto, Hamilton & Buffalo Navigation Co.</u>, 338 U.S. 396, 402 (1949) ("Perhaps no warning has been more repeated than that the determination of value cannot be reduced to inexorable rules."); <u>United States v. Cors</u>, 337 U.S. 325, 332 (1949). In cases such as this one, where the facts differ from the paradigm case of a permanent seizure of real property by eminent domain, the Supreme Court has characterized the damages analysis as "a guess, as well informed as possible, as to what the equivalent would probably have been had a voluntary exchange taken place." <u>Kimball Laundry Co. v. United States</u>, 338 U.S. 1, 6 (1979).

The question facing us in this case is how best to calculate the value of what was taken by the 1988 and 1990 statutes. A person valuing the amount taken at the time those statutes were enacted would consider the taking permanent and make the valuation determination on that basis. <u>See</u> <u>Almota Farmers Elevator & Warehouse Co. v. United States</u>, 409 U.S. 470, 474 (1973) (just compensation for a taking is measured as of the time of the taking). When subsequent action converts an otherwise permanent taking into a temporary one, just compensation is typically calculated in the same manner, adjusted to account for the subsequent events so that the damages will accurately reflect the value of what was taken. <u>See</u> <u>First English Evangelical Lutheran Church of Glendale v. County of Los Angeles</u>, 482 U.S. 304, 321 (1987); <u>Yuba</u>, 904 F.2d at 1581. The government insists that the enactment of the HOPE Act terminated the taking (and thus limited the damages to the pre-enactment period) by restoring the right of prepayment. In our initial opinion we held (and we reiterate today) that the

5

05-5034, -5035

government's valuation method does not reflect the value of what was taken. Because St. Andrews and Sherman Park did not have the choice of prepaying their mortgages at the time they entered into their use agreements, the damages determination cannot be conducted as if the HOPE Act had restored the plaintiffs' right to prepay their mortgages, after which they then voluntarily chose to forgo that right in favor of obtaining the use agreement benefits.

The government argues that the decision in this case is contrary to this court's decision in Wyatt v. United States, 271 F.3d 1090 (Fed. Cir. 2001), but there is a fundamental distinction between the two cases. In Wyatt, a mining company allowed its mining lease to expire while its permit application was pending. We held that the mining company could not assert a takings claim for the denial of the permit, because at the time of the denial the company had voluntarily relinquished its interest in the property in question. The difference between that case and this one is that in Wyatt the deprivation ended when the plaintiff "voluntarily relinquished its valid property interest." 271 F.3d at 1097 n.6. In this case, by contrast, St. Andrews and Sherman Park did not have a "valid property interest" in the right to prepay their mortgages at the time they entered into the use agreements, because that interest had been unconditionally extinguished by statute several years earlier.

The crux of the error in the government's argument can be found in its statement that "upon entering the use agreements plaintiffs gave up any prospective right to takings compensation, because they relinquished the very right that was the subject of their takings claim," i.e., the right to prepay the mortgages. The plaintiffs simply did not have that right at the time they purportedly "gave [it] up." While the act of entering into

6

the use agreements may have been voluntary, the plaintiffs cannot be said to have been restored. We therefore reiterate that the proper method for assessing the"voluntarily relinquishe[d]" a right that had already been taken by statute and had not damages suffered by St. Andrews and Sherman Park is to start with the damages that would have been assessed for a permanent taking and to reduce that amount by the value of the benefits conferred on St. Andrews and Sherman Park by the use agreements, as determined at the time they entered into the agreements.

Accordingly, the petition for rehearing is granted for purposes of supplementing our initial opinion with the clarification set forth above. In all other respects, the petition is denied.

05-5034, -5035