**BAY–HOUSTON TOWING COMPANY, INC., Plaintiff,**

and

**J.A. Hartman Corporation, Third–Party Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 01–88L.**

United States Court of Federal Claims.

Nov. 13, 2003.

George W. Miller, Hogan & Hartson, L.L.P., Washington, D.C., for plaintiff. Jonathan T. Stoel, Steven D. Weyhing, and Arthur L. Forbes, of counsel. Sam Kalen, Van Ness Feldman, P.C., Washington, D.C., for third-party plaintiff.

Dorothy R. Burakreis, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, for defendant. Arvis V. Freimuts, U.S. Army Corps of Engineers, and James Cha, U.S. Environmental Protection Agency, of counsel.

## OPINION

BRUGGINK, Judge.

This is an action for a permanent and/or temporary taking pursuant to the Fifth Amendment. Plaintiff Bay–Houston Towing Company and third party plaintiff J.A. Hartman Corporation own peat bogs in Michigan. They assert that their property was taken without compensation during the process to obtain a permit for mining peat. Pending are plaintiffs' and defendant's cross-motions for summary judgment as well as defendant's motion to dismiss. Oral argument was held June 5, 2003, after which the court requested supplemental briefing. For the reasons set forth below, defendant's motion to dismiss is granted with respect to counts I through IV of both the complaint and J.A. Hartman's third party complaint, and summary judgment is granted as to count V of both complaints.

## BACKGROUND

Bay–Houston Towing Company ("Bay–Houston"), and its predecessor-in-interest J.A. Hartman Corp., have been mining peat under the name Michigan Peat, Inc. in the Minden Bog area of Sanilac County, Michigan continuously since 1958. Between 1958 and 1978, Bay–Houston acquired several parcels of land, through purchase in fee simple and by lease. Bay–Houston leases 1,520 acres in an area designated Minden North from J.A. Hartman and owns an additional contiguous 480 acres in that area. J.A. Hartman originally owned Michigan Peat, Inc., but sold the business, including the name, to Bay–Houston in 1967, though it retained

ownership in the 1,520 acres it now leases to Bay–Houston.[1] Mining has taken place on approximately 951 acres of the Minden North area, while the remaining 1,049 acres are unharvested. The company harvests, processes, and packages the peat before it is sold.

A little less than a mile away, Bay–Houston also owns in fee simple approximately 819 acres, designated Minden South. It acquired this parcel in several purchases from 1975 to 1978. All of Minden South remains unharvested. Minden North and South have different Michigan tax ID numbers.

By 1991, Bay–Houston had conducted mining operations on approximately 850 acres of Minden North, without a permit, and without the indication that it needed one. In July of 1991, however, Bay–Houston was informed by the Michigan Department of Natural Resources ("MDNR")[2] that it needed a permit to continue harvesting peat in Minden Bog, pursuant to § 404 of the Clean Water Act ("CWA") of 1977. See 33 U.S.C. § 1344(a) (2001). On August 2, Bay–Houston applied for a § 404 permit requesting permission to expand harvesting and discharging from the already mined 850 acres to an additional 700 acres, in Minden North. In the same permit application, it also sought a permit to mine all of Minden South.

The application was submitted to the MDNR rather than the Environmental Protection Agency ("EPA") because Michigan was then one of only two states authorized to issue federal permits. See 40 C.F.R. 233.70. Approval of the permit was subject to the condition that MDNR had to address any concerns or objections voiced by EPA after that agency reviewed the application. See 33 U.S.C. § 1344(h) (2001). If EPA expressed objections, and MDNR did not address EPA's concerns in the permit, permitting authority would transfer to the Army Corps of Engineers (the "Corps"). 33 U.S.C. § 1344(j); see Friends of Crystal River v. EPA, 35 F.3d 1073, 1075 (6th Cir.1994).

On August 29, 1991, MDNR wrote Bay–Houston that more information was necessary to complete the permit application. Bay–Houston was told the application file would be temporarily closed in October 1991 to enable Bay–Houston to collect and submit the requested information. The information was submitted on June 4, 1992 and the file was reopened. On June 17, a public notice was issued regarding the pendency of the application. The Corps commented in a July 21, 1992 letter on what it viewed as Bay–Houston's failure to provide an "alternatives analysis." In August 1992, EPA, the Fish and Wildlife Service (F & WS), and the Corps inspected the land in question and shortly thereafter voiced concerns in writing about granting the permit. That month, Bay–Houston requested that MDNR again close its application in order to further supplement its application.

In a letter dated August 17, 1993, the Corps recommended that no permit be allowed until Bay–Houston submitted a plan for mitigation and restoration (including the removal of clay roads established to assist in the removal of peat). In September, F & WS also recommended denial of the permit, but based its response on Bay–Houston's asserted inability to identify endangered species and wildlife in the proposed harvesting area and on what it viewed as inadequate restoration plans. On January 4, 1993, MDNR notified Bay–Houston that it would be unable to issue a permit until after an extensive environmental assessment had been conducted.

Bay–Houston did not pursue its 1991 application further. Instead, in September 1994, Bay–Houston filed a renewed application, incorporating the assessment results. This application was different from the initial one in several respects. The second application made three requests: (1) a definition of the extent of the mining areas opened prior to October 1, 1980; (2) an after-the-fact permit for areas mined between October 1, 1980 (initial application of the CWA) and the pres-

---

1. Bay–Houston, J.A. Hartman, and Michigan Peat are hereinafter collectively referred to as "Bay–Houston."

2. The MDNR was the permitting agency on the first occasion Bay–Houston filed for a permit and remained so until the Michigan Department of Environmental Quality took over in 1995.

ent; and (3) authorization to expand mining operations over the next forty-plus years to previously unmined areas, including the remaining 1,150 acres of Minden North and all 819 acres of Minden South.

The application stated that Bay–Houston intended to remove all shrubby vegetation immediately upon permit receipt, but would clear the peat based on market demand. Additionally, Bay–Houston stated it would eventually remove all usable peat from the area, leaving a mix of open water and saturated peat for regeneration. Bay–Houston alleged that this would lead to a more diverse habitat. At this point, the application process had taken over three years and cost Bay–Houston over half a million dollars.

In December, EPA submitted official comments on the new permit application and assessment. They were based, in part, on letters EPA had, in turn, received from F & WS and the Corps. The agency objected to issuance of the permit as requested. EPA stated that the application lacked an adequate alternatives analysis, a description of any minimization steps taken, as well as a detailed compensation plan. EPA pointed out that the expansion would ultimately affect 2,819 acres of the Minden bog area. In its letter to MDNR, EPA expressed the view that any additional loss of Minden Bog would be an "irrevocable step away from being able to re-establish this rare and irreplaceable ecosystem."

On March 21, 1995, MDNR offered Bay–Houston an initial proffered permit ("IPP"). The proffer addressed the concerns of EPA and met its approval. The IPP approached the application in three parts, based on various components of the two bog parcels. The 749 acres of Minden North mined prior to October 1, 1980 were not within the agency's jurisdiction because they were mined prior to the adoption of the Michigan Goemaere–Anderson Wetland Protection Act. Second, the 202 acres of Minden North mined between October 1, 1980 and 1995 were eligible for an after-the-fact permit, assuming Bay–Houston accepted a number of permit conditions.

The remainder of Minden North and the entirety of Minden South constituted the third area. Due to "substantial adverse effects" of mining on the wetlands, no mining would be allowed in this area. The permit stated,

> After due consideration of the permit application, on-site investigation and other pertinent materials, the Department finds that any further expansion of peat mining will have a significant adverse impact on the natural resources, public interest, and public trust held in the unmined wetland areas. In addition, a feasible and prudent alternative to mining of the entire area exists.

The agency went on to say that allowing mining in the undeveloped area would "result in the direct loss of a rare and irreplaceable natural resource." The MDNR did not believe the benefits of the additional mining would outweigh the "detriments that will result from the project due to the impairment and destruction of the aquatic resources involved," and therefore "based on the foregoing findings, the portion of [the] application proposing expansion of the peat removal operation into the unmined area of the Minden Bog" was "denied."

The IPP also placed a number of conditions on the permittee. Bay–Houston was to construct and monitor a 29 acre reclamation test pilot plot. The company also was supposed to reclaim 4.1 acres for every 1 acre it had mined after the Act's effective date. Once each cell[3] was reclaimed, Bay–Houston was to "place the reclaimed area under a deed restriction, conservation easement, or equivalent legal instrument which will ensure that the reclaimed wetlands will be protected in perpetuity." Bay–Houston was also to provide a two million dollar performance bond to assure MDNR it would mitigate and reclaim the land. EPA withdrew its objections so long as the permit ultimately issued did not differ materially from the IPP.

Bay–Houston responded by letter on April 30, 1995, rejecting the terms of the IPP. Bay–Houston did not agree with placing limitations on 202 acres of Minden North in

---

**3.** The property is broken into separate plots called cells.

order to obtain an "after-the-fact" permit for mining consummated after the effective date of the of CWA. Nor would it accept the decision to deny all mining privileges on the remaining unmined property. Without Bay–Houston's signature, the permit could not take effect.

In May 1995, Bay–Houston filed an administrative appeal with MDNR, challenging the conditions of the after-the-fact permit for the 202 acres. Bay–Houston contemporaneously filed a takings claim against the state in the Michigan Claims Court, alleging that the state had deprived it of all economically viable use of the undeveloped portion of Minden North and all of Minden South.

In June 1995, while the appeal and suit were pending, Bay–Houston and MDNR signed an agreement limited to the 202 previously-mined acres. By its terms, Bay–Houston was allowed to continue mining on those acres as the proceedings unfolded, but mining could not expand beyond that acreage or to the 749 other developed acres within Minden North.

The Michigan Department of Environmental Quality (MDEQ) took over as the relevant state permitting agency shortly after the administrative appeal and suit were filed. In August 1996, MDEQ offered a new proposal for a permit for Bay–Houston. It was considerably more favorable to Bay–Houston than the previous IPP and granted the company more of the mining rights it initially sought. MDEQ sought EPA's approval on the new proposal, but EPA refused to endorse it, stating that the proposal differed too much from the IPP the agency had originally agreed to and granted Bay–Houston authority to perform many of the activities to which EPA objected.

In February 1997, Bay–Houston agreed to meet with MDEQ and EPA to discuss a compromise, but discussions were unsuccessful. In March of that year, MDEQ, with the assistance of EPA, composed a "Draft Process Outline for Bay Houston Permit Proposal," delineating three possible outcomes:

1. MDEQ could issue a permit with EPA approval for a smaller project than that requested on the original permit application.

2. MDEQ could choose not to issue a permit and Bay–Houston would proceed with the taking litigation in state court. In that event, EPA could elect to bring an enforcement action under section 404 against Bay–Houston for operating without a permit.

3. MDEQ could issue a "state only" permit over the objections of EPA. At that point, federal permitting authority would transfer to the Corps.

On May 16, 1997, before EPA had an opportunity to file an enforcement action, Bay–Houston filed a complaint against EPA and MDEQ in the District Court for the Eastern District of Michigan (before Judge Avern Cohn). The complaint sought "pre-enforcement review" and a declaratory judgment that would enjoin the agencies from issuing a "state only" permit because such a permit would undercut the takings claim Bay–Houston was trying to assert against the state in the Michigan Claims Court. *See Michigan Peat v. EPA,* 7 F.Supp.2d 896 (E.D.Mich.1998).

On June 6, 1997, MDEQ issued a "state only" permit giving "state only" authorization to harvest peat on more or less all 2,819 acres of both Minden North and South, as requested in Bay–Houston's initial 1994 application. The permit was issued without public comment and over EPA's objection. The permit did not constitute federal authorization. As a result, the power to grant federal approval was transferred to the Corps. In June 1997, the Corps officially informed Bay–Houston that it would handle Bay–Houston's permit and would begin processing a permit upon receipt of a complete application.

On February 9, 1998, EPA issued a CWA § 309(a) administrative compliance order directing Bay–Houston to stop mining and discharging until it had obtained a permit from the Corps. Although Bay–Houston initially informed EPA that it would not comply with the order, in April 1998 it agreed to stop mining until the dispute was settled. However, in 1999 and 2000 Bay–Houston recommenced mining in previously-mined areas. Bay–Houston alleges that the mining in 1999

and 2000 was authorized after an agreement between the company and the United States, with Judge Cohn's approval, allowing harvesting of 951 previously mined acres.[4] In 2001, the district court issued an interim order specifically allowing mining on a portion of Minden North, under certain conditions.

On May 11, 1998, the district court dismissed Bay–Houston's claims. Judge Cohn decided that MDEQ had not consented to be sued and was therefore immune under the Eleventh Amendment. He concluded that the court lacked subject matter jurisdiction to hear the claim against EPA because the actions taken thus far by the agency were not subject to judicial review. *See Michigan Peat*, 7 F.Supp.2d at 897. Judge Cohn wrote that,

> EPA had the power to comment on and object to any proposed permit, which it did. And besides the recent issuance of a preenforcement compliance order to Michigan Peat, this is all the EPA did. The Court accordingly lacks subject matter jurisdiction because, under the CWA, "judicial review of preenforcement orders" by the EPA "is not available."

*Id.* at 899 (citations omitted). Bay–Houston appealed to the Sixth Circuit Court of Appeals.

Prior to a decision on appeal, on June 28, 1998, the Department of Justice filed an enforcement action on behalf of EPA against Bay–Houston in federal district court (also before Judge Cohn), claiming violations of §§ 309, 404, and 402 of the CWA. *United States v. Bay–Houston Towing Co.*, 197 F.Supp.2d 788 (E.D.Mich.2002). EPA alleged Bay–Houston was discharging pollutants into the water without the approved §§ 402 and 404 permits. Bay–Houston was also allegedly violating § 309 by not observ-

ing the compliance order issued in February, directing Bay–Houston to halt mining until it obtained permits. EPA sought injunctive relief and civil penalties in the amount of $3 million. Though Bay–Houston was issued, and agreed to, a § 402 permit on July 24, 1998, the court did not consider the § 402 permit question moot, as Bay–Houston's compliance with the permit was subject to review.

By December 1998, at the suggestion of the district court, Bay–Houston completed its application to the Corps to mine and discharge fill material on the 951 previously-mined acres of Minden North. Bay–Houston did not reapply for permission to mine the undeveloped areas of Minden North or any of Minden South. By the end of February 1999, the Corps had made several requests for additional information, which Bay–Houston provided. The Corps thereafter issued a notice inviting public comment.

In a letter dated March 25, 1999, EPA asked the Corps not to issue a permit at that time. The EPA strongly recommended that the Corps not process the permit while an enforcement action over the same property was pending.[5] This was consistent with a past agreement between EPA and the Corps.[6] The Corps, however, continued to process the application.

EPA also contended that Bay–Houston had not met the § 404(b)(1) application requirements by failing to provide information about the environmental impacts of the mining operations on its own and surrounding property and by not providing adequate information regarding a mitigation compensation plan. For similar reasons, F & WS objected to the issuance of a permit until Bay–Houston offered what it viewed as an adequate mitigation plan. The public also

---

4. The agreement can be found in *United States v. Bay–Houston Towing Co.*, 197 F. Supp 2d 788, 820 (E.D.Mich.2002) ("[Michigan Peat] resumed peat mining in 1999... under the 'umbrella' of the Court.") which will be subsequently discussed. However, it is disputed whether the government ever agreed to the 1999 and 2000 interim restrictions.

5. Bay–Houston contends 33 C.F.R. § 326.3(e) "is not absolute: the Corps [ ] may continue process-

ing an application if it is 'clearly appropriate.' " *Bay–Houston Towing Co.*, 197 F.Supp.2d at 826 n. 23.

6. The 1989 Memorandum of Agreement between EPA and the Corps, regarding enforcement of CWA § 404 and Corps regulations at 33 C.F.R. § 326.3(e), restricted issuance of permits during enforcement actions.

offered its concerns about the effects of mining on water quality, wildlife, and neighboring properties. All of these complaints were forwarded to Bay–Houston on March 31, 1999.

On April 28, 1999, the Sixth Circuit Court of Appeals ruled on the appeal of the dismissal of Bay–Houston's declaratory judgment action against MDEQ and EPA. *See Michigan Peat v. EPA,* 175 F.3d 422 (6th Cir.1999). The court affirmed MDEQ's immunity from suit and dismissed the claim against it. It held, however, that the district court erred with respect to whether it had jurisdiction over EPA's actions. The appellate court found that EPA's action was final and subject to judicial review:

> While it is true that the 1995 permit specifically stated that it was not valid or final until signed and accepted by the permittee and returned to the MIDEQ, the logical conclusion is that the EPA's action was final. Statutorily, there was nothing left for the EPA to do once it signed off on the proposed permit. Moreover, if Michigan Peat did sign the permit it would have waived the appellate remedies it is pursuing.

*Id.* at 428. The lower court's ruling with respect to the claim against EPA was reversed and remanded for further review.

In response to the complaints forwarded to it in March in connection with its 1998 application, Bay–Houston prepared a report entitled, *Wetland Reclamation Proposal Minden Site,* dated April 30, 1999. The report set out Bay–Houston's plan to collect information in an effort to develop a final reclamation plan (within 31 weeks) which would address the aforementioned concerns. Though the report made mention of issues such as buffer zones and increasing functionality of the wetland, there was no mention of compensatory mitigation. Concurrently, Bay–Houston's expert wetland consultants prepared a response to the Corps' coordination letter which also addressed concerns over the

effect of drainage ditches and removal of surface water. This response was delivered on May 5, 1999.

The Corps then began a review of the application, which concluded in March of 2000. The Corps was ready to propose a permit. On March 15, 2000, the Department of Justice informed both Bay–Houston and the district court that a permit was ready for proposal pending final disposition of the enforcement action. At a status conference on April 4, 2001, the district court requested the Corps to continue the permitting process. Though the enforcement action was ongoing, the court assured the Corps, by order, that it should be able to continue the permitting process without violating regulations or the interagency agreement. The Corps elected to proceed with the permitting process.

With the enforcement action and permitting process still ongoing, Bay–Houston filed its complaint here on February 20, 2001. It consists of five counts. In count I, Bay–Houston claims the government has denied its rights to mine peat in all of Minden South and 1,049 acres of Minden North, thereby denying Bay–Houston all economically viable use of that land without just compensation in violation of the Takings Clause. Count II addresses the same parcels, alleging a severe diminution in value, as well as a frustration of Bay–Houston's investment-backed expectations. In count III, Bay–Houston alleges that an application for a permit to mine the previously mined 951 acres would be futile and therefore all of Minden North and South have been taken without just compensation. In count IV, Bay–Houston claims that the government's actions have effected a diminution in the value of all of Bay–Houston's property as well as frustrated its investment-backed expectations. Count V alleges that defendant's delays in the permitting process have effected a temporary taking of all of Minden North and South. On July 18, 2002, J.A. Hartman, which owns approximately 1,520 acres in Minden North, joined as a third-party plaintiff.[7]

---

7. Hartman's third party complaint sets out five counts identical in legal theory to those in Bay–Houston's complaint applicable to the 1,520 acres of land in Minden North owned in fee by Hartman. For the sake of simplicity, our discussion here focuses on the counts raised in Bay–Houston's complaint, but our conclusions are applicable to Hartman's third party complaint as well.

Meanwhile, in the declaratory action brought by Bay–Houston, the district court granted summary judgment in favor of EPA. Judge Cohn decided that the agency's withdrawal of its objections to the IPP was not a final and binding action and that Bay–Houston did not hold a valid state permit to mine peat. On September 18, 2001, the Sixth Circuit Court of Appeals affirmed. *Michigan Peat v. EPA,* 19 Fed.Appx. 344 (6th Cir. 2001).

On January 10, 2002, the Corps issued an IPP solely with respect to the 951 previously mined acres, including an environmental assessment and a statement of findings. The IPP granted Bay–Houston an after-the-fact permit for the 951 acres. Discharge could continue on 830 of those acres [8] (less any exhausted cells or acreage that could be utilized for ditches), subject to the conditions set forth in the permit. The letter accompanying the permit, written by Lieutenant Colonel (LtC.) Richard Polo, acknowledged that peat mining can only take place in peat bogs (*i.e.,* there are no upland alternatives), but took the position that Bay–Houston could move its operation to locations where the resource was not so scarce, such as Maine, Minnesota, Canada, and outside the United States. These alternatives would have involved ending operations in Minden North and South, and purchasing new bogs elsewhere.

LtC. Polo made it clear that, if Bay–Houston had applied previously, a permit would not have been awarded for mining that has now been completed. The IPP also set out conditions that had to be met prior to further mining. Bay–Houston had to make modifications to minimize impact and implement a restoration plan. The Corps also demanded that Bay–Houston place all remaining unmined land owned by Bay–Houston and the land after mining had ceased "under the protection of Declarations of Restriction on Land Use (Declarations) so as to minimize the cumulative impacts of future expansion

beyond the proposed application ...." In this respect, the permit stated:

13. The permittee agrees to minimize direct, secondary and cumulative impacts to the Minden Bog by taking such action as may be necessary to ensure that a subunit of the property consisting of the remaining unmined bog wetlands ... is placed under the protection of a perpetual deed restriction designed to maintain it in its natural undisturbed condition in perpetuity and not be subject to any alteration ... [and] agrees to take such action as may be necessary to cause the mined bog to be placed under an equivalent set aside effective upon cessation of mining ....

This set-aside was requested by EPA and the F & WS.

In effect, Bay–Houston was being told that the Corps viewed the permit as a "living document," and that the agency reserved the right to make unilateral changes at any time in response to new information. Finally, the Corps requested a performance bond in the amount of nearly $2.5 million, which would be reduced by $2,500 per acre as recovery was completed on that acre.

Bay–Houston had sixty days to accept or file objections on the IPP. Bay–Houston prepared written comments and objections which reached the Corps on March 8, 2002. Brooks Williamson, a consultant for Bay–Houston, requested a meeting with the Corps to discuss the issues raised in Bay–Houston's response. A meeting was held on May 7, 2002, during which the Corps requested additional information. Bay–Houston agreed to provide it. Thereafter, the Corps continued to make numerous additional requests for such things as hydrology reports, clarification of peat reserves estimates, a piezometer [9] map, information on peat left in place for restoration, company employment information, a list of extenuating circumstances Bay–Houston believed limited mining on certain cells, and a report of the economic importance of Minden peat mining. With the

---

**8.** 830 acres is the total acreage minus the area used to maintain the plant. Therefore, Bay–Houston requested a permit for 951 acres, 121 of that was used by the processing plant, leaving 830 acres available for mining.

**9.** An instrument for measuring pressure, WEBSTER'S II NEW REVISED UNIVERSITY DICTIONARY 890 (1988), used to determine groundwater level.

exception of information requesting economic data, Bay–Houston complied; the additional information was sent to the Corps on July 26, 2002. The company indicated it would provide the economic data if the Corps would acknowledge its propriety nature. However, the Corps decided to process the permit without this final information. The Corps made further telephone requests for information on July 24, 2002, which Bay–Houston responded to on July 29.

While these exchanges were going on, on March 13, 2002, Judge Cohn ruled in the enforcement action. *United States v. Bay–Houston*, 197 F.Supp.2d 788 (E.D.Mich.2002). The decision only dealt with whether a civil penalty for mining without §§ 402 or 404 permits was appropriate. He held that it was not. Bay–Houston had been actively seeking a permit for over five years and had never been squarely directed to fully close down. The arguments Bay–Houston made during the permitting process were not frivolous and it was not intentionally trying to slow the process.

Meanwhile, by January 24, 2003, the Corps' Project Manager had completed reviewing the application, objections, and further documentation. On March 11, 2003, the Corps district engineer issued a proffered permit to Bay–Houston. The permit allowed mining on the entirety of the 951 previously-mined acres for three years (then the company could request renewal) and did not include any deed restrictions on the unmined portions of Bay–Houston's property, except for a 330–foot buffer around Minden North where it abuts other properties. The proffered permit continued to impose a number of conditions, however. A separate review and approval would be required for mining on previously undeveloped land. Bay–Houston was reminded that the permit would be a "living document," subject to unilateral change by the agency. The permit was also conditioned on Bay–Houston implementing re-vegetation plans, submitting reports and summaries, and providing a performance bond, now reduced to $575,500. Bay–Houston

alleges in connection with the motions for summary judgment that the permit would ultimately require it to replace more peat than it would be able to harvest.

On May 7, 2003, Bay–Houston filed an administrative appeal with the Corps. It objected to the "sloping" depth restriction, the "ditch redesign," the three year permit limitation, the monitoring and reclamation requirements, and the fact that the permit could be altered unilaterally in the future.[10] The administrative appeal remains pending.

We will attempt to recap, at least from the court's perspective, how things currently stand in plaintiffs' long journey. In our view, there have been three separate applications commencing in 1991, 1994, and 1998 respectively. The first two were abandoned or overtaken by subsequent processes, or both. Only the final application, in short, was not terminated voluntarily. That 1998 application, it is important to note, relates only to a portion of Minden North and is still pending.

## DISCUSSION

### Bay–Houston's Permanent Takings Claims (Counts I–IV)

Regulatory takings claims fall into two judicially-created categories. One, recognized in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), turns on whether the property has effectively no remaining economic value. In that event, a *per se*, or categorical, taking arises. A second type of taking arises when the property retains some economic value. In that event the line of cases evolving from *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), assesses circumstances in terms of three considerably less categorical factors: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. 438 U.S. at 124, 98 S.Ct. 2646.

---

10. A copy of the appeal was furnished to the district court, in response to which Judge Cohn issued an interim order allowing Bay–Houston to continue harvesting previously-mined acres during 2003.

As we explain below, in our view the difficulty for plaintiffs here is that the argument for a categorical *Lucas*-type taking incorrectly assumes that the first two applications for a permit resulted in a final permit rejection for a parcel, rendering it void of any real economic value, while the argument for a non-categorical *Penn Central*-type taking encounters the problem that the relevant application is still unresolved. Neither type of claim, in short, is ripe.

Defendant argues that Bay–Houston's claims for a permanent taking, counts I through IV, are not ripe for judicial review. The currently pending application as to the developed areas of Minden North is plainly not final, as plaintiffs concede.[11] This means that counts III and IV, as they relate to the 951 previously-mined acres of Minden North, are not ripe for review. Defendant also alleges that counts I and II, as well as III and IV, to the extent they cover the undeveloped section of Minden North and all of Minden South, are also not ripe because no "final" decision has ever been made on an adequate record as to those parcels. Indeed, no application has ever been fully pursued for those parcels. The government also contends that MDNR's 1995 decision denying Bay–Houston's 1994 permit application was not "final" agency action because the application was incomplete and remained to be approved by EPA. Likewise, it argues that EPA's comments and actions throughout the permitting procedure, both before and after the 1994 permit application was denied, did not render the application to harvest peat on the undeveloped parts of Minden North and all of Minden South "futile."

11. Although the Corps issued a final decision as to the developed section of Minden North on March 3, 2003, that decision is currently on appeal, and therefore not ripe for review. *See* 33 C.F.R. § 331.10 (2002) ("The final Corps decision on a permit application is the initial decision to issue or deny a permit, unless the applicant submits a [request for appeal ('RFA')], and the division engineer accepts the RFA."). Plaintiffs do not dispute this conclusion.

12. Indeed, just a few years prior to the *Williamson* decision, Justice Brennan, recognizing the potential for abuse, cited a California city attorney giving his fellow municipal attorneys the following advice at an annual conference:

Plaintiffs' opposition to defendant's motion alleges that the government's actions, when realistically viewed as a whole, constitute a final decision disallowing meaningful use of the undeveloped Minden properties, or alternatively, that further pursuit of administrative remedies would be futile. Therefore, plaintiffs argue, those permanent takings claims are ripe for review. We disagree.

The first hurdle for a landowner seeking compensation for an alleged regulatory taking is to establish that the claim is ripe. *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). In *Williamson County*, the Court made it clear that "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Id.* at 186, 105 S.Ct. 3108. Recognizing that "among the factors of particular significance in the [takings] inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations," the Court believed those factors could not adequately be considered "until the administrative agency has arrived at a final, definitive position ...." *Id.* at 191, 105 S.Ct. 3108. While this test appears relatively simple at first blush, as commentators have recognized, a strict interpretation of the ripeness doctrine would provide agencies with no incentive to issue a final decision. *See, e.g.*, Gregory M. Stein, *Regulatory Takings and Ripeness in the Federal Courts*, 48 VAND. L. REV. 1, 45–46 (1995).[12]

> *"IF ALL ELSE FAILS, MERELY AMEND THE REGULATION AND START OVER AGAIN.*
>
> If legal preventive maintenance does not work, and you still receive a claim attacking the land use regulation, or if you try the case and lose, don't worry about it. All is not lost. One of the extra 'goodies' contained in the recent [California] Supreme Court case of *Selby v. City of San Buenaventura*, 10 C[al].3d 110[, 109 Cal.Rptr. 799, 514 P.2d 111 (1973)], appears to allow the City to change the regulation in question, even after trial and judgment, make it more reasonable, more restrictive, or whatever, and everybody starts over again.
> . . . .

The Court has therefore not required absolute finality in all cases. *See Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001); *MacDonald, Sommer & Frates v. County of Yolo,* 477 U.S. 340, 350 n. 7, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986) (stating "[a] property owner is of course not required to resort to ... unfair procedures in order to obtain [a] determination" of whether compensation is due). In *Palazzolo,* the Court observed that:

> While a landowner must give a land-use authority an opportunity to exercise its discretion, once it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened....

*Palazzolo,* 533 U.S. at 620, 121 S.Ct. 2448. A landowner, however:

> may not establish a taking before a land-use authority has the opportunity, using its own reasonable procedures, to decide and explain the reach of a challenged regulation. Under our ripeness rules a takings claim based on a law or regulation which is alleged to go too far in burdening property depends upon the landowner's first having followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering development plans for the property .... As a general rule, until these ordinary processes have been followed the extent of the restriction on property is not known and a regulatory taking has not yet been established. Government authorities, of course, may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision.

*Id.* at 620–21, 121 S.Ct. 2448.

■ Therefore, while governmental regulatory bodies are granted a great deal of discretion, *see Suitum v. Tahoe Regional Planning Agency,* 520 U.S. 725, 738, 117

S.Ct. 1659, 137 L.Ed.2d 980 (1997), a takings claim may become ripe for review before the issuance of a final decision where it is plain that the requested land use will not be permitted or the regulatory body has employed repetitive or unfair land-use procedures in order to avoid issuing a final decision. *See Cooley v. United States,* 324 F.3d 1297 (Fed. Cir.2003) (holding that a takings claim is ripe when the agency's position is "reasonably certain" through denial of a permit or sufficient evidence of futility); *Washoe County v. United States,* 319 F.3d 1320 (Fed.Cir.2003).

In *Cooley,* the Federal Circuit affirmed the Court of Federal Claims' decision that an initial denial of a § 404 permit constituted a final decision even though the Corps later issued a provisional permit ostensibly granting the landowner permission to develop the entire property at issue. 324 F.3d at 1301–02. In 1972, Cooley purchased a thirty-three acre parcel of land in Coon Rapids, Minnesota, with the intention of developing the property for mixed-use commercial purposes. In 1990, a year after Cooley had begun developing the property and securing permits for development, the Corps informed Cooley that the land constituted wetlands and that Cooley would consequently need a § 404 permit to continue development. In 1993, the Corps denied Cooley's permit in an official letter, although several months later, after Cooley filed a claim in the Court of Federal Claims, the Corps informed Cooley that some permit could be issued for a narrower scope project. *Id.* at 1300. Although Cooley was not interested, ten days before trial the Corps issued a provisional permit allowing the development of the entire parcel under certain conditions. Cooley rejected the permit and continued with litigation.

The Federal Circuit held that the 1993 permit denial rendered the Corps' decision final, regardless of the agency's subsequent efforts to issue a permit, thus making Cooley's takings claim ripe for review. *Id.* at 1302. "Because the Corps denied Cooley's

---

See how easy it is to be a City Attorney. Sometimes you can lose the battle and still win the war. Good luck."
*San Diego Gas & Elec. Co. v. City of San Diego,* 450 U.S. 621, 655 n. 22, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting)

(quoting Longtin, *Avoiding and Defending Constitutional Attacks on Land Use Regulations (Including Inverse Condemnation), in* 38B NIMLO MUNICIPAL LAW REVIEW 192–93 (1975) (emphasis in original)) (alteration in original).

application for a § 404 permit based on what it considered adequate information, and because no Corps regulation permitted an administrative appeal, the 1993 denial was a final decision. Thus the takings claim was ripe." *Id.* at 1302. The court, however, did not end its analysis at that point. "Even if, arguendo, the 1993 denial did not constitute a final decision, it would have been futile for Cooley to pursue further prosecution of the permit application.... Submitting a new application is futile when unchanging facts and applicable law preclude a permit." *Id.* at 1302–03. The court found that:

> [i]n the present case, the Corps denied the permit in the public interest to avoid damage to valuable wetland resources.... Because the Corps regulations offered no process to change a final decision on the merits that could not be changed with additional documentation, the Court of Federal Claims correctly held that further pursuit of a process already years old was futile.

*Id.* at 1303.

Ripeness, in short, is a mixed question of law and fact. The court must examine the permitting procedure to determine if either of two circumstances are present: the permitting agency has engaged in repetitive or unfair land-use procedures in order to avoid a final decision, or the agency's position on the matter is "final," because no further process is available or because the agency has made it clear that it views the facts or law as requiring a particular result, whether or not a final agency decision has officially been issued.

13. In deciding whether or not parcels are separate courts have considered such factors as: whether they can be developed together, whether they were sold and bought as one unit or in one sale, and whether they are separated by any distance. *See Forest Props., Inc. v. United States*, 177 F.3d 1360, 1365 (Fed.Cir.1999); *Bundrick v. United States*, 7 Cl.Ct. 532, 534 (1985), *aff'd in part and rev'd in part*, 785 F.2d 1009 (Fed.Cir. 1986); *Ciampitti v. United States*, 22 Cl.Ct. 310, 318 (1991) (stating that courts should consider certain factors such as "the degree of contiguity, the dates of acquisition, the extent to which the parcel has been treated as a single unit, [and] the extent to which the protected lands enhance the value of remaining lands ....").

■ Plaintiffs concede that, insofar as approximately half of Minden North is concerned, there has not been final agency action. The Corps of Engineers still has under consideration plaintiffs' application with respect to approximately 951 acres previously mined. That claim is not ripe while the only relevant application remains pending. We also believe this fact, for the present, is fatal to any other permanent taking claim based on a *Penn Central* analysis because the prior application included the developed portions of Minden North, as to which no final decision has been rendered.

■ With respect to all the unmined portions of the land, however, Bay–Houston asserts that MDNR's 1995 decision, or EPA's comments and proffered permit, constitute final agency action. Plaintiffs believe that any further permit application would be futile; that EPA has made clear its opposition to any further mining in those areas.

We believe that this aspect of plaintiffs' takings claim, though it approaches the bounds of ripeness, cannot be treated as ready for review. We begin with the fact that at no point were the undeveloped portions of Minden North and South ever made the subject of separate permit applications. Even if the 1991 and 1994 applications are not viewed as abandoned, in other words, they both included those developed portions of Minden North which are now the subject of the unresolved 1998 application. Nevertheless, even assuming the parcels should be viewed separately—and we believe there are reasonable grounds for doing so as to Minden South [13]—the parcels do not present ripe claims.

> In the present case, the best evidence defendant can point to that we are dealing with a single parcel is the fact that the August 1991 permit application and the September 1994 reapplication embraced both tracts. Bay–Houston made the conscious decision to link these two parcels in the application. We do not view this factor as dispositive, but it is plainly strong evidence that they should be viewed jointly for the present analysis.
>
> Other evidence suggests that Minden North and South could be treated separately, however. The two parcels are not contiguous. They are approximately three-quarters of a mile apart. The parcels were leased and purchased on different dates. Minden North is, for the most part,

Plaintiffs argue that the explicit terms of the MDNR's 1995 permit decision, with respect to the undeveloped portions of Minden North and Minden South, demonstrate that a final decision has been reached concerning mining in those areas. Plaintiffs point out that MDNR was acting with the full authority of the EPA and that the application itself was the product of a lengthy process of communication between MDNR and EPA. Plaintiffs state that the MDNR was charged with the authority and responsibility for implementing the § 404 permitting process in the State of Michigan. They also contend that the permit application submitted to MDNR in 1994 was complete and comprehensive—preparation itself required more than three years of work, cost Bay–Houston more than $500,000, involved 21 members of MDNR's professional staff, and included numerous on-site inspections by EPA, F & WS, and the Corps. Finally, plaintiffs point out that the 1995 denial issued by MDNR reflects objections raised by EPA, F & WS, and the Corps.

Defendant responds that if the 1995 denial is understood in context, it is still not finally clear what use might be permitted. Defendant points out that plaintiffs' original permit application sought "all or nothing" permission to mine all of Minden North and all of Minden South. Furthermore, defendant argues that plaintiffs' "alternatives analysis" in its permit application was incomplete, that plaintiffs' had failed to adequately demonstrate that all practicable steps had been taken to minimize potential adverse impacts, and that plaintiffs had failed to include a detailed mitigation plan. It is therefore defendant's contention that it remains unclear whether the Corps, which now holds permitting authority, might permit mining of some portion of Minden South if an application for Minden South was separately filed with all necessary analysis included. The 1995 denial is therefore not "final" as to Minden South or

the undeveloped portion of Minden North. We agree.

The short answer to plaintiffs' argument, we believe, is that the 1994 application by plaintiffs was never pursued to a final denial. Instead, after the administrative appeal, plaintiffs elected, in effect, to drop the 1994 appeals process and pursue the narrower application filed in 1998 with the Corps to mine the developed section of Minden North. We view the 1994 permit as superseded by plaintiffs' objections rather than as finally denied. Moreover, while we recognize that plaintiffs spent much time and money trying to cooperate with MDNR and provide it with all requested data, we are persuaded that the agencies' conduct heretofore should not be viewed as forfeiting their entitlement to some deference. Defendant has alleged that plaintiffs' 1994 permit was inadequate, and in fact, during the enforcement trial, plaintiffs' wetland consultant, Brooks Williamson, acknowledged that the 1994 permit application failed to include a formal reclamation plan, and that the 1994 environmental assessment failed to discuss the character of the Minden Bog and many of its hydrologic properties. *Cooley* instructs us that we may only find a permit denial "final" if the record before the permitting agency was complete. *See Cooley*, 324 F.3d at 1302 ("Because the Corps denied Cooley's application for a § 404 permit *based on what it considered adequate information* . . . the 1993 denial was a final decision." (emphasis added)). Here, we cannot say EPA's determination that the record needed further development was baseless.

Furthermore, the *Cooley* decision was also based partially on the fact that no adequate appellate procedure existed to review the Corps' decision. *Id.* That is not the case here. Bay–Houston was able to file an administrative appeal with MDNR following MDNR's decision. That review lead to a 1997 "state only" permit allowing Bay–Houston to mine peat on almost all of Minden North and South. Although EPA was not

leased from J.A. Hartman; Bay–Houston purchased Minden South in fee simple. The parcels have different tax ID numbers. Bay Houston also alleges that its plan is to send peat from Minden South to a different processing facility than the one used for peat from Minden North.

Peat would instead be shipped to its Sandusky facility, where reserves are nearly exhausted. The undisputed facts do not encompass all of these assertions, however, and, in any event, plaintiffs have treated the parcels jointly in the applications before us.

satisfied with that permit, and in fact instituted an enforcement action against Bay–Houston, Bay–Houston still did not file a permit application with the Corps until 1998. That application covered only the 951 previously-mined acres. Under the circumstances we cannot view the 1995 permit denial as "final."

Plaintiffs argue in the alternative that we should find their permanent takings claims ripe because, even if the 1995 permit denial cannot be considered a final decision, applying for a § 404 permit with the Corps as to the undeveloped portions of Minden North and all of Minden South would be futile. Plaintiffs again point out that the 1995 permit denial by MDNR was greatly influenced by the comments made by EPA, F & WS, and the Corps, and that those comments, and the agencies' actions, strongly suggest that the Corps would not permit any further mining in any of the undeveloped portions of either Minden North or Minden South. Plaintiffs point to a 1994 EPA comment letter emphasizing that the federal agencies involved in the permitting process opposed any expansion of peat harvesting into undeveloped acreage and recommended that Bay–Houston be required to restore the historically mined areas of Minden North. The comment letter specifically stated that "[a]dditional loss of the Minden Bog, therefore, represents an increasingly significant and irrevocable step away from being able to reestablish this rare and irreplaceable ecosystem."

Plaintiffs also allege that, after the 1995 permit denial, the United States has continued to oppose permitting Bay–Houston to harvest peat on the undeveloped portions of the Minden Bog, and has continued to express the same views of Minden Bog's uniqueness. Plaintiffs believe the EPA's objection to the "state only" permit and its commencement of an enforcement action against Bay–Houston provide further evidence of the futility of filing another permit

with the Corps. The Proffered Permit issued as to the developed 951 acres of Minden North on March 11, 2003, essentially eliminates peat-harvesting operations on even the developed 951 acres of Minden North, strongly indicating that the government will not allow mining on any of the undeveloped portions of Minden North and South.

Defendant counters that just because the 1995 MDNR decision was consistent with, and influenced by, the comments of certain federal agencies, the 1995 decision cannot be accepted as the final decision of the federal government itself. Nor is such evidence convincing that applying for a permit with the Corps as to the undeveloped portions of Minden North and all of Minden South would be futile. Defendant reiterates that agency comments on Bay–Houston's 1994 application were based on information that MDNR then had before it—information which the agencies found inadequate. Defendant points out that much of the opposition to plaintiffs' 1994 application was based on the duration of the permit sought. A letter dated December 23, 1994 to MDNR states that plaintiffs' proposed 40 year time frame was unacceptable. "[W]e recommend conditioning any permit to allow for the clearing and draining of only those areas which the applicant could reasonably mine in [a] 5–year period."

One cannot read the extensive record in this action without concluding that the relevant federal regulators are very unhappy with the prospect of further mining anywhere in Minden North or Minden South.[14] Many of the comments made and action taken by defendant at all stages of Bay–Houston's lengthy permitting odyssey make it clear that the government views the Minden Bog as ecologically unique and that it would like to preserve as much as possible in a natural state. We are not, however, able or obligated to read defendant's mind. We do not, at this point, know that it would be futile for Bay–Houston to apply for a permit solely as to Minden South, or as to undeveloped

**14.** Telling in this regard is the statement of LtC. Richard Polo, in the letter accompanying the IPP for the developed section of Minden North. Polo took the position that plaintiffs could shut down their Michigan operation and move to locations where the resource is not so scarce, such as

Maine, Minnesota, Canada, and outside the United States. How that suggestion differs from outright denial is not apparent. We presume such a cavalier suggestion would not figure in future deliberations.

portions of Minden North.[15] It is unclear what the Corps would do with such applications. When faced with the possibility of triggering a *Lucas*-style taking as to a separate undeveloped parcel, the agency may choose to allow plaintiffs to mine a section of the property. The record is not yet sufficient for us to conclude that the government has exercised its powers of eminent domain.

In sum, plaintiffs' permanent takings claims with respect to Minden North are not ripe for review because the developed section of Minden North is still undergoing the permitting process and because plaintiffs have not pursued a final decision concerning the undeveloped section. Likewise, plaintiffs' permanent takings claims with respect to Minden South are not ripe for review because Minden South has never been the subject of a separate application. Defendant's motion to dismiss counts I through IV is therefore granted.

*Plaintiffs' Temporary Takings Claim (Count V)*

■ Plaintiffs claim that defendant's actions over the course of the permitting process, including its transfer of permitting authority to the Corps and its commencement of an enforcement action against Bay–Houston, "have effected a temporary taking of all of its interests in all of Minden South and all of Minden North."[16] Defendant argues that plaintiffs' temporary takings claim should be dismissed pursuant to RCFC 12(b)(6) or, alternatively, through summary judgment under RCFC 56.

The Federal Circuit has made it clear that "absent denial of [a] permit, only an extraordinary delay in the permitting process can give rise to a compensable taking." *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1349–50 (Fed.Cir.2002); *see also Cooley*, 324 F.3d at 1306; *Wyatt v. United States*, 271 F.3d 1090, 1098 (Fed.Cir.2001). Furthermore, courts are unlikely to "find a taking based on extraordinary delay without

a concomitant showing of bad faith ...." *Cooley*, 324 F.3d at 1307; *see also Wyatt*, 271 F.3d at 1098. We are instructed to keep in mind, moreover, the fact that "delay is inherent in complex regulatory permitting schemes," and that we must "examine the nature of the permitting process as well as the reasons for delay." *Wyatt*, 271 F.3d at 1098. Much that we have already said in the context of plaintiffs' permanent takings claims is applicable to the analysis here— many of the facts examined pursuant to the ripeness test, discussed above, overlap the facts to be examined here—and we do not feel it necessary to restate that material in its entirety.

*Wyatt* is particularly instructive. *Wyatt* involved a fourteen-year permitting process in which a mine operator fruitlessly struggled with state and federal agencies to obtain a mining permit. EMI, who held an exclusive lease to mine the property at issue, initiated the permitting procedure in 1980, and, after a succession of one-year permits issued by the state, EMI was denied a further permit in 1984. That same year, the state's authority to conduct such permitting was revoked, and the Department of the Interior assumed control through the Office of Surface Mining Regulation and Enforcement. EMI again applied for a permit in October of 1984. Because of deficiencies in the information provided to OSM, EMI's permit was denied in 1986. A lengthy period of review followed, which did not end in a final decision until 1994. Throughout the review process, EMI was continually asked to supplement the information provided, but it never satisfied OSM.

Despite the length of the permitting process in *Wyatt*, the Federal Circuit found that any delay in the process was "not sufficiently 'extraordinary' to constitute a taking." *Id.* at 1097. The court acknowledged that complex regulatory schemes required detailed information before a permit could

---

**15.** If the undeveloped portions of Minden North were the subject of a separate application, however, plaintiffs would likely face different legal dynamics than those triggered by a separate application as to Minden South because of prior development of Minden North.

**16.** At oral argument, plaintiffs conceded that no temporary takings claim could be alleged as to the developed section of Minden North due to Judge Cohn's interim orders granting permission to Bay–Houston to mine that section.

be issued. *Id.* at 1098. Without such information the government is unable to make an adequate determination of the impacts the activity may have on the environment. *Id.* "Government agencies that implement complex permitting schemes should be afforded significant deference in determining what additional information is required to satisfy statutorily imposed obligations." *Id.* The court examined the details of the permitting process and determined that, in light of the deference afforded agencies under such circumstances, the requests made by OSM for additional information were reasonable, that EMI had not responded adequately, and that there was, consequently, no grounds for finding any "extraordinary" delay. *Id.* at 1098–1100.

Defendant contends that no extraordinary delay can be shown on the part of the government here, and that any delays in the permitting process were largely the result of plaintiffs' own actions. Furthermore, defendant believes there is no genuine issue of material fact as to plaintiffs' temporary takings claim because no permit process is even pending before the Corps for mining on any portion of the undeveloped areas of the Minden properties. Given plaintiffs' "all or nothing" approach in the initial permitting process, defendant argues, and its failure to adequately support the 1994 permit application, plaintiffs are unable to show any bad faith or unreasonable delay on the part of the United States.

Plaintiffs respond that over the eleven years of the permitting dispute, Bay–Houston has faithfully participated in the permitting process, yet has been denied the full economic usefulness of the Minden properties. Plaintiffs believe the United States has repeatedly engaged in conduct bordering on bad faith in order to delay the permitting process. Plaintiffs point out three specific events demonstrating defendant's efforts to slow the permitting process. First, plaintiffs point out that defendant objected to a proposed MDNR § 404 permit that would have permitted peat harvesting on the undeveloped portions of Minden North and South and instead transferred control over Bay–Houston's application to the Corps more than

six years after the permitting process began. Second, plaintiffs argue EPA's 1998 enforcement action against Bay–Houston evidences bad faith or unreasonable delay. Lastly, plaintiffs propose as further evidence of delay the fact that the Corps took more than three years to respond to Bay–Houston's third permitting application with respect to the developed section of Minden North.

Alternatively, plaintiffs argue that defendant's motion for summary judgment should be dismissed because there are material facts in dispute, specifically: (1) whether the government regulation has deprived Bay–Houston of all, or substantially all, economically viable use of the undeveloped portions of the Minden properties; and (2) whether the United States or Bay–Houston is responsible for the extraordinary delay in the § 404 permitting process.

We cannot find any credible showing of bad faith on the part of the government, nor can we conclude that the plaintiffs' proffered facts show an "extraordinary" delay in light of the complex permitting mechanism in which MDNR, EPA, F & WS, and the Corps have all played a role. The facts presented here do not materially differ from those in *Wyatt.* The § 404 permitting process administered by MDNR, and now the Corps, is at least as complex as the mining regulations at issue in *Wyatt.* Just as in *Wyatt,* the permitting agencies here found plaintiffs' 1994 permitting application inadequate. Even if incorrect, there is no evidence offered which, even collectively considered, would permit a finding of agency bad faith.

The transfer of permitting authority from MDEQ to the Corps is not evidence of any extraordinary delay on the part of defendant. Such a transfer is an integral part of the CWA permitting procedure and within the government's discretion. Permitting authority was only transferred to the Corps after the state agency provided Bay–Houston with a "state only" permit over EPA's objections. Furthermore, there was nothing patently unreasonable about EPA filing an enforcement action against Bay Houston when it proceeded to conduct mining operations pursuant to the disputed "state only" permit. Proceedings were further delayed, moreover, by

Bay–Houston's filing of an inverse condemnation suit against Michigan in 1995 and a "pre-enforcement review" action against EPA in 1997. We agree with the district court that Bay–Houston's suit was not frivolous nor intentionally dilatory, but neither was the EPA's enforcement action. Both, however, slowed down the process. Furthermore, as defendant points out, plaintiffs agreed to file a renewed permitting application with the Corp for the developed section of Minden North, but have never filed such a renewed application for the remaining portions of the Minden properties.

Considering the complexity of the permitting process at issue here, we cannot find any genuine issue of material fact as to whether the delay here was extraordinary. Plaintiffs could have filed renewed permitting applications with the Corps as soon as they had the opportunity. Any delay experienced throughout this process was the product of the combined effort of all involved. It would be inappropriate to lay the blame solely at the feet of the government.

Because Bay–Houston has never pursued application with the Corps as to Minden South, it is clear that there has not been any extraordinary delay on the part of the government unique to that parcel, nor do we believe such an application would be futile. The delay as to portions not brought within the 1998 permit filed with the Corps cannot be fairly characterized as anything like a complete moratorium, in view of the fact that there was no bar to either making Minden South the subject of the 1998 permit application or pursuing it as a separate parcel.

We also believe it would be inappropriate to find that there has been extraordinary delay in the permitting process here as to only Minden North, considering the fact that Bay–Houston has, in fact, been able to mine portions of the property during periods throughout the permitting process. In July of 1991 Bay–Houston was informed by the MDNR that it needed a permit to continue harvesting peat in any of Minden Bog. At that time, however, neither MDNR nor the EPA required Bay–Houston to cease its peat mining operation. *See United States v. Bay–Houston Towing Co.*, 197 F.Supp.2d 788, 795

(E.D.Mich.2002). Furthermore, in June 1995, Bay–Houston and MDNR signed an agreement allowing mining in 202 previously-mined acres, allowing Bay–Houston to mine that sections as the permitting process unfolded. Although EPA issued a CWA § 309(a) administrative compliance order on February 9, 1998, directing Bay–Houston to stop mining and discharging until it had obtained a permit from the Corps, in early 1999 Bay–Houston recommenced mining in areas previously mined pursuant to interim orders issued by the district court.

The present facts are thus not even as compelling as the claim rejected in *Tahoe*, which involved a total moratorium on development for a period of almost three years. *Tahoe–Sierra Preservation Council*, 535 U.S. at 306, 122 S.Ct. 1465. In short, during the entire permitting process, there was only a period of a few months in which Bay–Houston was required to cease all mining activity. This fact, combined with our conclusion that any delay experienced by plaintiffs was not extraordinary, further convinces us that defendant's motion for summary judgment as to Bay–Houston's temporary takings claim should be granted.

Plaintiffs' frustration with the permitting process is understandable. They have expended a considerable amount of time and money during a permitting process that thus far has lead to no clear result. Nevertheless, we are persuaded that the facts asserted are presently insufficient as a matter of law. If and when plaintiffs receive a final decision concerning the extent of mining allowed on the Minden Properties, they will have the option of refiling their takings claim against the government if they believe compensation is due.

## CONCLUSION

For the reasons set forth above, defendant's motion to dismiss counts I through IV of both the complaint and the third party complaint is granted. Because we find the action unripe for review, we do not reach the parties' substantive arguments, and therefore, those claims are dismissed without prejudice. Defendant's motion for summary judgment as to count V of both complaints is

also granted. Costs to each party. The clerk is directed to enter judgment accordingly dismissing the action.